575 S.E.2d 597

Jasper A. BLACKBURN, Claimant Below, Appellant,

v.

WORKERS' COMPENSATION DIVISION and Marrowbone Development Company, Respondent Below, Appellees.

No. 29543.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 8, 2002.

Decided Nov. 27, 2002.

Dissenting Opinion of Justice Maynard Dec. 9, 2002.

Concurring and Dissenting Opinion of Justice Albright Dec. 11, 2002.

Linda S. Rice, James M. Robinson, Robinson and Rice, L.C., Huntington, West Virginia, Attorneys for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Robert M. Nunley, Senior Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellee, Workers' Compensation Division.

DAVIS, Chief Justice:

This appeal presents a challenge to the way permanent partial disability awards have been determined in Workers' Compensation hearing loss cases since this Court handed down its decision in *Bilbrey v. Workers' Compensation Commissioner*, 186 W.Va. 319, 412 S.E.2d 513 (1991). Particularly, Mr. Jasper Blackburn challenges the practice of automatically basing a disability award on the audiogram demonstrating the lowest level of hearing loss when there is a discrepancy between audiograms that exceeds the margin of error. We find that additional rules should be promulgated to create uniformity in the way audiograms are conducted and to establish a method for selecting the best valid audiogram. Consequently, we direct the Division to promulgate such rules. Until such time as these rules are in place, we find that where two valid audiograms are within a margin of error of plus or minus ten decibels, the liberality rule should be applied, and the claimant should be given the benefit of the audiogram demonstrating a higher level of hearing loss. Where two valid audiograms differ by a margin greater than plus or minus ten decibels, then an additional audiogram should be performed.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Mr. Jasper Blackburn (hereinafter "Mr. Blackburn"), the claimant below and appellant herein, worked for more than ten years as a mechanic for Marrowbone Development Company (hereinafter "Marrowbone"), respondent below, appellee herein. He was also employed by Marrowbone as a heavy equipment operator for just over one-and-one-half years.[1] The record indicates that Mr. Blackburn last worked for Marrowbone on September 4, 1995, when he was laid off. On October 30, 1995, Mr. Blackburn was examined by Dr. Joseph Touma and underwent audiometric testing administered by Laura Bedell Garish, a certified Clinical Audiologist, to ascertain his level of occupational noise induced hearing loss.[2] The reliability of the audiogram was ranked at fair to good. Based upon the examination and the results of the audiogram, Dr. Touma concluded that Mr. Blackburn had suffered a work-related noise-induced hearing loss and determined that he had sustained a 10.65% impairment as a result of this hearing loss. Mr. Blackburn then initiated a claim with the Workers' Compensation Division (hereinafter "the Division") by filing a "Report of Occupational Hearing Loss"[3] on November 27, 1995. His

---

**1.** According to his WC–123HL form, Mr. Blackburn was a mechanic for Marrowbone from February 24, 1982, until January 31, 1993. During most of the period between January 1993 and February 1994, Mr. Blackburn was employed as a mechanic for another company in Kentucky. He then returned to Marrowbone and worked as a heavy equipment operator from February 21, 1994, until September 4, 1995, when he was laid off.

**2.** The speech discrimination portion of the audiogram was administered using a monitored live voice as opposed to a recorded voice.

**3.** This report is also commonly identified as a "WC–123HL" form.

claim was held compensable on February 21, 1996, and Mr. Blackburn was referred by the Division to Dr. Sherman Hatfield. Dr. Hatfield and his staff evaluated Mr. Blackburn on March 25, 1996. As part of the evaluation, Mr. Blackburn was given an audiogram by Brenda D. George, a certified audiologist.[4] The reliability of the audiogram was rated good. Based upon the evaluation, Dr. Hatfield recommended a .73% whole person impairment.

Nearly two years later, by order entered March 4, 1998, the Division granted Mr. Blackburn a 10.65% permanent partial disability (hereinafter "PPD") award based upon Dr. Touma's recommendations. Both parties protested the order and it was referred to the Workers' Compensation Office of Judges (hereinafter "the OOJ"). In connection with the protest, Dr. Touma was deposed on November 3, 1998. He testified that Dr. Hatfield's audiogram revealed better thresholds than his own, and that Dr. Hatfield's audiogram had also produced a more accurate representation of Mr. Blackburn's true hearing loss impairment. Thereafter, by order entered June 8, 1999, the OOJ affirmed the Division's award of 10.65% PPD. However, the order stated that because Dr. Hatfield's report had not been included in the record, it had not been considered by the OOJ in reaching its decision in this case. Marrowbone subsequently filed a motion for reconsideration based upon the Division's failure to include Dr. Hatfield's report in the record submitted to the OOJ. Marrowbone's motion was granted, and the OOJ subsequently issued an order finding that the audiogram obtained by Dr. Hatfield was the most reliable. Based upon Dr. Hatfield's audiogram, the OOJ reduced Mr. Blackburn's PPD award to .73%. On appeal, the Workers' Compensation Appeal Board (hereinafter "the WCAB") affirmed the .73% PPD award by order entered March 31, 2000. Mr. Blackburn then appealed the WCAB order to this Court, and oral argument was had on June 4, 2002. Thereafter, on June 13, 2002, this Court, on its own motion, scheduled this case for re-argument and directed the parties to file briefs addressing specific questions posed by the Court. Specifically, the Court asked the parties to address the following issues:

(1) are all tests being done at the level as specified in West Virginia law; (2) is there a standardized system of determining reliability of the tests; (3) set forth reasons why this Court should retain its holding in *James Bilbrey vs. WCC and Ranger Fuel Corporation*, [186 W.Va. 319,] 412 S.E.2d 513 (1991), adopt the rule of liberality, or adopt[ ] an alternative, and if so, what alternative; (4) explain the methods used to ascertain whether tests are being administered in accordance with West Virginia law and rules and regulations; and discuss the impact of a margin of error.

The parties are hereby directed to inform the Court of any differing expert opinions which have come about since 1991 when the Court decided *Bilbrey*, regarding how the "best valid audiogram" is to be determined when all audiograms are reliable and within the margin of error.

Further, the parties are hereby directed to advance to the Court their own recommendations for resolving conflicts in the evidence in work-related hearing loss claims.

Finally, the parties are hereby directed to relay to the Court the differing schools of thought, if any, as to whether work-related hearing loss is progressive or static.

The case was re-argued and submitted for decision on October 8, 2002.

## II.

### STANDARD OF REVIEW

In this case we are asked to reconsider our prior holding in *Bilbrey v. Workers' Comp. Comm'r*, 186 W.Va. 319, 412 S.E.2d 513 (1991), and to revise the standards for evaluating Workers' Compensation hearing loss claims. These present legal questions which we review *de novo*.

---

**4.** As with the audiogram performed for Dr. Touma, the speech discrimination portion of this audiogram was administered using a monitored live voice.

"As we said in *Barnett v. State Workmen's Compensation Com[m]'r*, 153 W.Va. 796, 812, 172 S.E.2d 698, 707 (1970), '[w]hile the findings of fact of the [WCAB] are conclusive unless they are manifestly against the weight of the evidence, the legal conclusions of the appeal board, based upon such findings, are subject to review by the courts.' Conclusions of law are subject to de novo scrutiny. Syl. pt. 3, *Adkins v. Gatson*, 192 W.Va. 561, 453 S.E.2d 395 (1994); Syl. pt. 1, *Randolph County Board of Education v. Scalia*, 182 W.Va. 289, 387 S.E.2d 524 (1989). Where the issue on an appeal is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review. Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995); Syl. pt. 1, *University of West Virginia Bd. of Trustees on Behalf of West Virginia University v. Fox*, 197 W.Va. 91, 475 S.E.2d 91 (1996)."

*Rhodes v. Workers' Comp. Div.*, 209 W.Va. 8, 12, 543 S.E.2d 289, 293 (2000) (quoting *Conley v. Workers' Comp. Div.*, 199 W.Va. 196, 199, 483 S.E.2d 542, 545 (1997)).

## III.

## DISCUSSION

In our discussion of this case, we first review the parties' contentions with respect to the error assigned by Mr. Blackburn. We then summarize their various answers to the particular questions raised by this Court. After providing this information, we announce our decision of this matter.

### A. Assignment of Error

Mr. Blackburn argues on appeal that this Court's opinion in *Bilbrey v. Workers' Comp. Comm'r*, 186 W.Va. 319, 412 S.E.2d 513 (1991), is inconsistent with the liberality rule and should no longer be followed. Mr. Blackburn contends that *Bilbrey's* directive, which states that an audiogram showing the least amount of hearing loss should be used to determine the amount of noise-induced hearing loss when there is a difference between audiograms which is greater than the margin of error, fails to acknowledge that an audiogram is a subjective test.

Marrowbone responds that this Court in *Bilbrey* correctly recognized the universally accepted medical principle that any deterioration in an individual's hearing after the date of last exposure is due to some factor other than the prior occupational noise exposure. Following this principle, Marrowbone notes, Drs. Hatfield *and* Touma both agreed that Dr. Hatfield's audiogram should be used to determine the degree of whole person impairment suffered by Mr. Blackburn. Marrowbone further submits that the rule of liberality is intended to resolve *conflicts* in the evidence. Marrowbone points out that there is no conflict in the evidence presented in this case due to the agreement of the examining physicians that Dr. Hatfield's test represents the most accurate measure of Mr. Blackburn's impairment. Moreover, Marrowbone argues that hearing loss claims are unique by nature, as recognized by this Court in *Bilbrey*, and, due to the inherent differences between hearing loss claims and other types of claims (particularly in the fact that noise induced hearing loss is not a progressive condition—as are other types of occupational conditions), the principles this Court established in *Bilbrey* were correct and should not be repudiated. Marrowbone finally observes the liberality rule was well established at the time *Bilbrey* was decided, and thus it is not a valid basis upon which to alter *Bilbrey*.

The Division responds that in view of the concurring opinions of Drs. Touma and Hatfield, the only evaluating otolaryngologists of record in this claim, the reliable, probative and substantial evidence of record overwhelmingly supports the decision of the OOJ. Hence, the WCAB order affirming the OOJ was not plainly wrong. Additionally, the Division contends that the treatment of hearing loss claims pursuant to *Bilbrey* is not inconsistent with the liberality rule. The Division directs this Court to the well-established principle that the liberality rule does not relieve claimants of the burden of substantiating their claims. In this case, the Division maintains, both evaluating physicians agree that the proper measure of Mr. Blackburn's impairment is .73%. Thus, there is no proper evidence supporting a higher award.

### B. Issues Raised by the Court

In response to the Court's questions on re-hearing, the parties to this action agreed among themselves to utilize the affidavits of two doctors: Dr. Gary D. Harris, Ph.D., a certified audiologist, and Dr. William C. Morgan, Jr., M.D., an otolaryngologist. Relying on these two experts, the parties' answers to the Court's questions are largely in agreement. Following is a brief summary of the answers to each of the Court's questions.

**1. Are all tests being done at the level specified in West Virginia law?** The parties agree that all audiometric tests currently being relied upon to either support a diagnosis of noise-induced hearing loss or to ascertain the appropriate level of disability resulting therefrom are being done at the levels specified in West Virginia law, specifically W. Va.Code § 23–4–6b (1986) (Repl.Vol.2002).[5] The parties further agree that there are no requirements as to the order in which the tests are performed, and no uniformity as to the manner in which the tests are being conducted. The Division additionally explains that since at least 1958, it has been recognized that certain methods of presenting the pure tones used in an audiogram can affect the patient's responses.

**2. Is there a standardized system of determining reliability of the tests?** The parties' responses to this particular issue differ somewhat. Mr. Blackburn contends that there is no uniform system for determining the reliability of audiometric testing as the outcome of audiometric testing is essentially subjective. Marrowbone, on the other hand, asserts that the audiologist's rating of a test as "good," "fair," or "poor" provides one method of determining the reliability of the tests. However, Marrowbone suggests that any rating other than "good" by an audiologist should be accompanied by a specific explanation of the reason for the ranking. Marrowbone also states that there are other reliability indicators included on the WC–123HL form,[6] but in its experience the Division ignores these factors and relies solely on the audiologist's ranking. The Division agrees that the audiologist's rating is a method of determining reliability, and submits that there are a few other standardized methods for assessing the reliability of an audiogram. For instance, audiologists/ontologists typically conduct what is referred to as an SRT/PTA Comparison[7] to gauge the reliability of a test while it is being performed. Comparing two audiograms provides another measure of reliability. A third method of assessing reliability is to repeat the same pure tones at different points during an evaluation, as it is virtually impossible for an individual to remember whether or not he responded to a particular tone after having heard other tones in the meantime. The Division however, does not, assert that this method is used regularly, and we are aware of no requirement for its employment. Finally, the Division asserts that an indirect test of reliability arises from the education and training required in order to become an audiologist under W. Va.Code §§ 30–32–1 to –23 (Repl.Vol.2002).

**3. Should the Court to retain its holding in _Bilbrey_, adopt the rule of liberality in hearing loss cases, or adopt an alternative rule?** Mr. Blackburn again argues that

---

**5.** W. Va.Code § 23–4–6b(1) sets forth the sound frequencies at which hearing loss is to be measured. The Division notes that these frequencies correspond with the frequencies currently recommended for assessing hearing impairment by the American Academy of Otolaryngology and the American Medical Association.

**6.** Marrowbone refers specifically to: (1) the dates on which the audiometer was last calibrated (noting there are three types of calibration, namely "biennial exhaustive electroacoustic calibration," "semi-annual electroacoustic calibration," and "daily biological calibration"); (2) whether the audiologist holds a "Certificate of Clinical Competence in Audiology"; and (3) the speech reception threshold and pure tone average for each ear (for definitions of the terms "speech reception threshold" and "pure tone average," see _infra_ note 7).

**7.** The Division explains that SRT refers to "speech reception threshold" and "is defined as the lowest level, in terms of volume, at which a patient can repeat approximately fifty per cent [sic] of the "spondees" presented to him. A spondee is a two-syllable word with equal emphasis on each syllable, such as 'baseball.'" The Division further explains that, "PTA stands for pure tone average and historically has been the average for the three thresholds at five hundred, one thousand, and two thousand hertz."

*Bilbrey* should be abandoned because the measurement of noise-induced sensorineural hearing loss is subjective and lacks any standardized method of evaluating reliability. Mr. Blackburn submits that all evidence should be presumed reliable unless it can be proven otherwise and the claimant should be entitled to the benefit of the most favorable results obtained. Both Marrowbone and the Division contend this Court's holding in *Bilbrey* should be retained as the medical foundation upon which *Bilbrey* is based has not changed. Occupational hearing loss is a non-progressive occupational disease. This unique medical fact makes it inappropriate to use the rule of liberality to choose the higher of two widely-varying audiograms when attempting to ascertain the proper amount of impairment sustained by a claimant whose exposure to noise ended prior to the audiograms being administered. The Division additionally asserts that to use the rule of liberality in such cases would allow a judicially-created rule to take the place of proven scientific fact and would relieve claimants of their burden of establishing their claims.

**4. What are the methods used to ascertain whether tests are being administered in accordance with West Virginia law and rules and regulations?** In an answer that is somewhat unresponsive to the specific question asked, Mr. Blackburn submits that West Virginia laws, rules, and regulations pertaining to how tests are being administered , are inadequate. For example, he states that there are no statutes or regulations providing standards for the calibration of audiometers, for testing environments, or for any other equipment that may be used. Acknowledging that physicians are permitted to consider only noise-induced hearing loss in determining the degree of a claimant's impairment, Mr. Blackburn complains that it has become a widespread practice among physicians to adjust the threshold hearing shifts measured at each frequency to reflect other factors, particularly the effects of the natural aging process, even in the absence of

any evidence that a particular claimant's hearing has actually been diminished by such factors. Mr. Blackburn contends that this practice is inconsistent with legislative intent as neither the statute nor the regulations provide for any "adjustment" of test results based upon statistical probability or mere speculation by an evaluating physician. Marrowbone contends that the only method utilized by the Division to ensure that testing is being conducted in accordance with West Virginia law and rules is a letter to its evaluating professionals titled "Report Outline For Permanent Partial Disability Evaluation (Noise–Induced Hearing Loss Only)," which outlines the information sought by the Division and the procedure the Division requests the specialists to follow. The Division explains that, at this time, the only method in use to ascertain whether tests are being administered in accordance with West Virginia law, rules, and regulations is a visual inspection by its claims managers of the reports received from physicians and/or audiologists.[8]

**5. What is the impact of the margin of error?** Before relating the parties' comments regarding the impact of the margin of error, it should be noted that there presently is no law or regulation in place establishing the acceptable margin of error for hearing loss cases in this State. Mr. Blackburn and the Division are both supportive of using a margin of error of plus or minus five decibels when comparing audiograms by the same audiologist on the same machine that were administered on two different occasions. They also agree that a margin of error of plus or minus ten decibels is acceptable when comparing audiograms by different audiologists on different machines, due to possible differences in earphone placement and calibration. Marrowbone, however, considers a difference of plus or minus ten decibels to be too great, and urges that the margin of error should be set at plus or minus five decibels even when two audiograms have been administered at different clinics. Marrowbone and the Division effectively agree that the margin

---

**8.** The Division explains that when it receives an audiogram, the audiogram is reviewed by a Claims Manager who ascertains whether: (a) the audiogram was conducted at the sound frequency levels specified by statute; (b) the audiogram was performed by a certified audiologist; and (c) all other testing required by statute and regulations has been performed (i.e., air and bone conduction testing, speech reception threshold, and speech discrimination testing).

of error should not differ by the same amount, or in the same direction, at all frequencies. In other words, there should be interweaving between two valid audiograms.[9] In the absence of interweaving, they argue, the audiogram results should be considered suspicious. Using the instant case as an example, Marrowbone notes that Mr. Blackburn's two audiograms showed worse results at every one of the eight relevant frequencies. Thus, Marrowbone suggests, the differing results were not simply due to the "margin of error."

With regard to how the margin of error should be applied once it has been established, Mr. Blackburn and Marrowbone agree that when two tests fall within the appropriate margin of error, the results more favorable to the claimant should be used to determine his or her level of impairment. Where the difference between two audiograms exceeds the margin of error, Mr. Blackburn suggests that a third test should be performed by an evaluator of the claimant's or the Division's choosing, while Marrowbone suggests that the Division should be required to refer the claimant for a third audiometric evaluation that would include all tests necessary to ascertain the claimant's true level of hearing loss, including, but not limited to, brain stem audiometric testing and acoustic reflex testing.[10] The Division opines that when two audiograms differ by more than the accepted margin or error, and both have been performed after the date of last exposure, the evaluator needs to look for a cause other than occupational noise for the decreased hearing levels. Because noise-induced hearing loss is a static condition, the Division maintains that it is inappropriate to use the rule of liberality to choose the higher of two widely-varying audiograms in assigning the level of impairment.

**6. Are there any differing expert opinions that have come about since *Bilbrey* regarding how the "best valid audiogram" is to be determined when all audiograms are reliable and within the margin of error?** Mr. Blackburn, Marrowbone and the Division all agree that the medical foundation upon which *Bilbrey* is based has not changed, and they are aware of no expert opinions contrary to *Bilbrey* regarding how the "best valid audiogram" should be determined.

**7. What are your recommendations for resolving conflicts in the evidence in work-related hearing loss claims?** Mr. Blackburn adopts the recommendation advanced by Dr. Gary D. Harris in his deposition in this case. Dr. Harris' recommendation assumes that all audiograms under consideration are rated reliable and valid, and that they were performed after the date of last exposure to occupational noise. The recommendation also considers each ear separately and uses the four-frequency decibel sum for 500, 1000, 2000 and 3000 hertz, which are the levels used to calculate whole person impairment under the West Virginia Workers' Compensation laws. *See* W. Va.Code §§ 23–4–6b(b)(1) and (c)(1). Specifically, Dr. Harris suggests:

> If the four frequency decibel sum differs by 20 dB or less, then such audiograms are probably within the range of normal multiple-audiogram variability and both may represent a claimant's permanent hearing levels. Using the "worse" audiogram (the one with the highest four-frequency decibel sums) would give the claimant the benefit of the difference.

---

**9.** In his affidavit, Dr. Harris explains that he uses the term "interweaving," to refer to the fact that two valid audiograms "will tend to interweave with one audiogram showing some thresholds better and some thresholds worse than the comparison audiogram." Dr. Harris states that different audiograms with thresholds that vary no more than 10 dB, usually suggest unchanged hearing. However, these different audiograms, *in the absence of any real change in hearing,* may vary by as much as 10 dB at *some* frequencies, *but not at all the frequencies tested, and not in the same direction.*

**10.** *See* C.S.R. § 85–13–4.5, which states:

> In addition to the routine testing outlined in section 4.4 of this rule, physicians evaluating hearing loss claimants should have tympanometry, acoustic reflex and other tests performed, including but not limited to a brain stem audiometry test, any time such tests are needed to reach an informed decision. *Brain stem audiometric testing should be performed only when there is suspicion of an acoustic neuroma.*
> (Emphasis added).

If the four-frequency decibel sum differs by 40 dB or more on two different audiograms, then either some individual frequencies have differed by more than 10 dB, or there has been no interweaving [11] in the two audiograms. Two audiograms with four-frequency decibel sums that vary by 40 dB or more in either ear are significantly different, regardless of the reason for the difference. The better of the two tests, assuming it met all the criteria previously discussed, is a better representation of the claimant's permanent hearing loss. This leaves then audiograms with four-frequency decibels sums [sic] that differ by more than 20 dB, but less than 40 dB. In such instances it would be reasonable to obtain a third audiogram to see if the most accurate representation of a claimant's permanent occupationally related hearing levels can be determined.

Stated simply, Marrowbone suggests that where two audiograms are within a margin of error of plus or minus five decibels, regardless of whether there is interweaving,[12] the claimant's award should be calculated from the audiogram that is most favorable to him or her. Where the difference between two audiograms is between five and ten decibels per frequency, Marrowbone proposes that additional testing should be performed to obtain an accurate depiction of the claimant's true hearing level. Finally, where the difference between two audiograms represents a difference that is greater than an average of ten decibels per frequency for the eight measured frequencies in the whole person impairment calculation, then the audiogram demonstrating the greater degree of impairment should be discounted so long as: (1) the claimant is no longer exposed to occupational noise; (2) both audiograms were obtained *after* the claimant's exposure to occupational noise had ceased; and (3) the audiogram showing the lower degree of whole person impairment was unequivocally of "good" reliability.

Finally, the Division recommends that when two audiograms that are both deemed reliable differ by an amount that is within the accepted margin of error, either audiogram would be appropriate upon which to base a compensation award. In these circumstances, the rule of liberality could be applied to select the audiogram that would provide a higher award of compensation. When two reliable audiograms differ by an amount greater than the margin of error, then the audiogram demonstrating the best level of hearing should be used. However, when two audiograms differ by an amount *considerably* greater than the margin of error, the prudent course would be to perform a third audiogram in an effort to determine the most accurate representation of a claimant's hearing loss.

8. **Is noise induced hearing loss progressive or static?** The parties agree that once exposure to occupational noise has stopped, occupational hearing less becomes a non-progressive condition.

### C. Decision

This case was first framed as simply raising the issue of whether the liberality rule should be applied to Workers' Compensation hearing loss cases. However, in our consideration of this case, it became readily apparent that, due to the unique medical nature of hearing loss claims, the actual issues that needed to be addressed were much more complex, as evidenced by our decision to direct the parties to file additional briefs addressing specific issues and to schedule this case for re-argument of those issues. We previously addressed the uniqueness of hearing loss claims in our decision in *Bilbrey v. Workers' Compensation Commissioner*, wherein we observed

> it is ... well accepted by experts that once exposure to noise ceases, hearing loss existing at that time must also cease any progression, unless other factors are involved in creating the hearing loss. Damage can be caused by many different factors other than noise, including, but not limited to, diabetes, hypertension and vascular diseases, otosclerosis, medications, hereditary problems, acoustic trauma, ag-

---

11. For a discussion of the term "interweaving," see *supra* note 9.

12. For a definition of the term "interweaving" as herein used, see *supra* note 9.

ing (presbycusis), and surgery. We should also note that the audiogram is a subjective test, as it measures a subject's response to noise. Thus, the reliability of the test and the validity of the results are important factors.

[E]xperts have pointed out that if there is a fluctuation in the hearing loss between audiograms which is greater than the margin of error, then the audiogram which shows the least amount of hearing loss should be used to determine the hearing loss due to noise exposure. The reasoning behind this rule is complicated, but important. As we noted above, once noise exposure stops, so does the progression of the hearing loss unless other factors are involved. Damage to hearing is permanent: Once the hair cells in the cochlea are destroyed, the cells cannot be rejuvenated. Thus, once the damage is done, one's hearing can get neither better nor worse because of noise exposure, but it can get worse because of a secondary condition, such as the conditions listed above. Thus, if one audiogram shows a substantially worse four frequency total than a second audiogram, the expert must work with the premise that since a noise-induced loss is static, some other factor must be responsible for the difference between the two audiograms, such as a sinus or eustachian tube problem. Accordingly, *the better audiogram of the two should be used as the audiogram most representative of the sensorineural loss,* since the difference between the best and the worst audiograms must be caused by something other than noise.

186 W.Va. at 323–24, 412 S.E.2d at 517–18 (emphasis added) (footnotes omitted).

Prior to *Bilbrey*, there had been "little or no consistency in the manner in which the Commissioner grant[ed] permanent partial disability awards for noise-induced hearing impairment or in the tests that [were] required in order to determine what percentage of loss [was] actually due to noise." 186 W.Va. at 324, 412 S.E.2d at 518. *Bilbrey* established numerous guidelines in an attempt to correct these inadequacies and to provide a system under which the Division

could reach consistent results while also providing a record that would permit this Court a meaningful review. However, *Bilbrey* stopped short of directing how certain required tests should be performed. 186 W.Va. at 323, 412 S.E.2d at 517 ("[O]ur opinion today does not instruct the physicians how to perform the tests discussed, but instead, advises as to what tests must be performed in order for this Court to reach an informed decision on appeal.").

Through this appeal, however, it has become apparent that perhaps the *Bilbrey* decision should not have been so limited. As this case and *Bilbrey* exemplify, often two audiograms performed on the same patient will obtain significantly different results. Such differences may be the result of a variety of factors, not the least of which is the fact that an audiogram is a very subjective test. In *Bilbrey*, we opined that "if one audiogram shows a substantially worse four frequency total than a second audiogram, the expert must work with the premise that since a noise-induced loss is static, some other factor must be responsible for the difference between the two audiograms, such as a sinus or eustachian tube problem." 186 W.Va. at 324, 412 S.E.2d at 518.

Notwithstanding the *Bilbrey* Court's explanation that "experts have pointed out that if there is a fluctuation in the hearing loss between audiograms which is greater than the margin of error, *then the audiogram which shows the least amount of hearing loss should be used* to determine the hearing loss due to noise exposure," 186 W.Va. at 323–24, 412 S.E.2d at 517–18 (emphasis added), the Court nevertheless went on to state, *in dicta,* that where the difference between two audiograms was greater than the margin of error, "the *better audiogram* of the two should be used as the audiogram most representative of the sensorineural loss." *Id.* at 324, 412 S.E.2d at 518. Thus, by using the phrase "better audiogram" as opposed to a more specific phrase referring to "the audiogram which shows the least amount of hearing loss," the *Bilbrey* Court appears to have rejected the expert view in favor of a more neutral procedure. Unfortunately, the Court failed to elaborate on just what it meant by

the term "better." It is also important to note that, while the Division, and to some degree the bar, have apparently interpreted *Bilbrey's* explanation of the expert view as a holding, the *Bilbrey* Court stopped short of creating any new principle of law regarding how to determine which of two widely varying, yet apparently valid, audiograms most accurately represents a claimant's true level of hearing loss. Therefore, we endeavor to do so here.

Without minimizing the impact that the subjectivity of audiograms has on the results obtained, the evidence presently before this Court suggests that a variety of factors unrelated to the claimant's condition or cooperation with the testing process may also impact those results. Such factors may include the manner in which the testing is conducted, whether the speech discrimination portion of an audiogram is administered using a monitored live voice or a recorded voice, the methods used to calibrate the machinery, or perhaps even the type or brand of machinery used. We believe that establishing uniformity with regard to factors such as these would further the goals *Bilbrey* initially identified, namely obtaining consistent results in hearing loss cases and providing for a more meaningful review. Another problem that has come to light in this appeal is the ab-

sence of any established margin of error. Without a definitively set margin or error, there can be no assurance of consistency in the application of any rule pertaining to hearing loss claims that utilizes the margin of error.

■ Additionally, we commented in *Bilbrey* that, because of the subjectivity of audiograms, the reliability and validity of the test results become important factors. 186 W.Va. at 323, 412 S.E.2d at 517 ("The audiogram is a subjective test, as it measures a subject's response to noise. Thus, the reliability of the test and the validity of the results are important factors."). The parties to this case, and the experts providing evidence on their behalf, have indicated that while there are numerous methods for judging reliability and validity that are commonly used within the profession, there exist no specific laws or rules mandating their use, and there is no place provided on the workers' compensation hearing loss forms to indicate or ascertain their use.[13] Requiring that specific reliability and validity measures be utilized and recorded, the audiograms would presumptively be more accurate, their reliability could be more effectively monitored by the Division, and the review process would be enhanced. Thus, for the reasons hereto-

13. Dr. Harris explained in his affidavit that

> Test/retest threshold reliability has been discussed and studied since the inception of the electronic pure tone test. It has been known since at least 1958 that certain methods of presenting the pure tones to the patient can affect the patient's responses. Specifically, it has been known since 1958 that comparing thresholds obtained using an ascending stimulus presentation, to thresholds obtained using a descending stimulus presentation can provide an internal reliability check."

(Citation omitted). Dr. Harris further explained that

> Commonly, 1 kHz thresholds are obtained twice with the 1 kHz test threshold expected to be within 5 dB of the 1 kHz retest threshold for the ear under test....

> Providing a place on the workers' compensation audiogram form for recording the test/retest thresholds at 1 kHz will help insure that such is done.

> Having one threshold sought in ascending (soft to loud) trials and then the other sought with descending (loud to soft) trials, will enhance the sensitivity of this comparison in determining reliability (Woodford C, et al. A screening test for pseudohypacusis. *The Hearing Review*, No. 1977).

Dr. Harris suggests that this information could be elicited from the test audiologist by including a form similar to the following on the audiogram:

ascending 1 kHz threshold right ear ____ descending 1 kHz threshold right ear ____
ascending 1 kHz threshold left ear ____ descending 1 kHz threshold left ear ____

fore mentioned, we hold that the Workers' Compensation Division is directed to establish appropriate guidelines for the specific manner in which audiograms should be administered.[14] In developing these guidelines, the Division should consider, *inter alia:* (1) whether all audiograms should be administered using a uniform brand and model of audiometer; (2) whether guidelines should be adopted for when and how audiometers should be uniformly calibrated; (3) establishing a definitive margin of error; (4) requiring audiologists to perform specific reliability and validity checks during the course of an audiogram; (5) modifying the existing WC–123HL form to allow for the reporting of any required reliability and validity checks; (6) whether the speech discrimination portion of all audiograms should be conducted using only a recorded voice; and (7) what method should be used to select an appropriate audiogram when two audiograms that are both

rated "good" differ by more than the established margin of error.[15]

 Recognizing that it will take some time before these rules will be in place, we endeavor to provide some guidance for the resolution of hearing loss cases involving two differing audiograms in the interim. First, when two audiograms that have both been rated valid differ substantially in their results, it appears to us, based upon the information provided by the parties to this case, that the difference strongly indicates that something other than the claimant's level of hearing may have impacted the results of one, or perhaps both, of the tests. Under these circumstances, particularly in consideration of the fact that occupational hearing loss is not a progressive condition once the claimant's exposure to noise has ended, we believe it would be foolish to adopt a rule directing blind acceptance of the audiogram

---

14. It has been explained that:

> [T]he Legislature has delegated the ... rule-making function to the Commissioner of the Bureau of Employment Programs and the Workers' Compensation Division thereof. *See* W. Va.Code § 23–1–1(b) (2000) (Supp.2001) ("The commissioner is authorized to promulgate rules and regulations to implement the provisions of this chapter."); W. Va.Code § 21A–2–6(2) (1996) (Supp.2001) (recognizing Commissioner's authority to "promulgate rules"); Syl. pt. 7, *Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975) ("The State Workmen's Compensation Commissioner may exercise not only the powers expressly granted the office by statute, but also such additional powers of a procedural or administrative nature as are reasonably implied as a necessary incident to the expressed powers of the office."). *See also* W. Va.Code § 23–1–13(a) (1995) (Repl.Vol.1998) ("The workers' compensation division shall adopt reasonable and proper rules of procedure, regulate and provide for ... the nature and extent of the proofs and evidence, the method of taking and furnishing the same to establish the rights to benefits or compensation from the fund ... or directly from employers ..., and the method of making investigations, physical examinations and inspections[.]"); W. Va.Code § 23–4–6(i)(1999) (Supp.2001) ("The workers' compensation division shall adopt standards for the evaluation of claimants and the determination of a claimant's degree of whole body medical impairment.").
> *Repass v. Workers' Comp. Div.,* 212 W.Va. 86, 105–06, 569 S.E.2d 162, 181–82 (2002) (Davis, C.J., dissenting).

15. We recognize that the Division exercises its rule-making function in cooperation with the Health Care Advisory Panel and the Compensation Programs Performance Council:

> To facilitate the adoption of such rules and regulations for disability determinations, the Legislature authorized the Commissioner to create the Health Care Advisory Panel to assist with the "[e]stablish[ment of] protocols and procedures for the performance of examinations or evaluations performed by physicians or medical examiners[.]" W. Va.Code § 23–4–3b(b) (1990) (Repl.Vol.1998). Similarly, the Legislature established the Compensation Programs Performance Council, W. Va.Code § 21A–3–1 (1993) (Repl.Vol.1996), [hereinafter referred to as the "Performance Council"] to further assist the Commissioner with the development of such criteria and to "[r]ecommend legislation and establish regulations designed to ensure the effective administration and financial viability of... the workers' compensation system of West Virginia." W. Va.Code § 21A–3–7(b) (1993) (Repl.Vol.1996). The Performance Council is additionally charged with the "[r]eview and approv[al], reject[ion] or modif[ication of] rules and regulations that are proposed or promulgated by the commissioner for the operation of the workers' compensation system before the filing of the rules and regulations with the secretary of state." W. Va.Code § 21A–3–7(c).
> *Repass,* 212 W.Va. at 106, 569 S.E.2d at 182 (Davis, C.J., dissenting). Accordingly, we direct the Division to establish rules with the understanding that it will follow the appropriate statutory requirements in doing so.

demonstrating a more significant hearing loss. Indeed, it is well established that the liberality rule does not take the place of proper evidence.

In the past, the Court has consistently adhered to the principle that "the liberality rule cannot be considered as taking the place of proper and satisfactory proof." *Bilchak v. State Workmen's Comp. Comm'r*, 153 W.Va. 288, 297, 168 S.E.2d 723, 729 (1969). *Accord* Syl. pt. 3, *Clark v. State Workmen's Comp. Comm'r*, 155 W.Va. 726, 187 S.E.2d 213 (1972); *Smith v. State Workmen's Comp. Comm'r*, 155 W.Va. 883, 888, 189 S.E.2d 838, 841 (1972) (per curiam); Syl. pt. 3, *Staubs v. State Workmen's Comp. Comm'r*, 153 W.Va. 337, 168 S.E.2d 730 (1969); *Dunlap v. State Workmen's Comp. Comm'r*, 152 W.Va. 359, 364, 163 S.E.2d 605, 608 (1968); *Hosey v. Workmen's Comp. Comm'r*, 151 W.Va. 172, 176, 151 S.E.2d 729, 731 (1966); Syl. pt. 1, *Deverick v. State Comp. Director*, 150 W.Va. 145, 144 S.E.2d 498 (1965).

*Repass v. Workers' Comp. Div.*, 212 W.Va. 86, 111–13, 569 S.E.2d 162, 188–89, (2002) (Davis, C.J., dissenting). Instead, we find the liberality rule should be applied only when two differing audiograms are within the margin of error. Until such time as the Division identifies the margin of error to be applied, a measurement of plus or minus ten decibels shall be used.[16] Where two audiograms fall outside this margin, additional testing should be conducted. Accordingly, we hold that until such time as the Division has promulgated additional rules for administering audiograms in workers' compensation hearing loss cases, when two valid audio-

grams that have both been performed after the claimant's date of last exposure to occupational noise are within a margin of error of plus or minus ten decibels, and do not differ by the same amount or in the same direction at all frequencies, the rule of liberality should be applied and the claimant should be granted a permanent partial disability award based upon the audiogram demonstrating a higher level of hearing loss. Additionally, we hold that until such time as the Workers' Compensation Division has promulgated additional rules for administering audiograms in workers' compensation hearing loss cases, when two valid audiograms that have both been performed after the claimant's date of last exposure to occupational noise fall outside a margin of error of plus or minus ten decibels, or are within a margin of error of plus or minus ten decibels but differ in the same amount or in the same direction at all frequencies, then the claimant should undergo additional testing. Presumably the third audiogram will be within a margin of error of ten decibels of one of the existing two audiograms, and will not differ by the same amount or in the same direction at all frequencies, so that the rule of liberality may be applied to the two audiograms falling within this criteria, and the claimant may be granted a permanent partial disability award based upon the audiogram demonstrating a higher level of hearing loss. If a claimant chooses to have the additional testing performed by a physician of his or her choosing, then the claimant shall pay the expense of the testing. If, however, the claimant chooses to have the Division select the examining

---

**16.** Marrowbone has agreed with the Division's position that when two valid audiograms fall within the margin of error, then it is appropriate to apply the liberality rule to grant a claimant the higher PPD award. However, Marrowbone urges that the margin of error should be set at plus or minus five decibels. Our decision to apply a margin of error of plus or minus ten decibels until such time as the Division establishes specific rules governing this area is based primarily upon the Division's observation that a margin of error of plus or minus ten decibels is acceptable when comparing audiograms by different audiologists on different machines, due to possible differences in earphone placement and calibration. Because the question of the appro-

priate margin of error is a matter better suited to the Division's expertise, we give deference to its opinion in this regard. *Cf.* Syl. pt. 4, *State ex rel. ACF Indus., Inc. v. Vieweg*, 204 W.Va. 525, 514 S.E.2d 176 (1999) ("Interpretations as to the meaning and application of workers' compensation statutes rendered by the Workers' Compensation Commissioner, as the governmental official charged with the administration and enforcement of the workers' compensation statutory law of this State, pursuant to W. Va.Code § 23-1-1 (1997) (Repl.Vol.1998), should be accorded deference if such interpretations are consistent with the legislation's plain meaning and ordinary construction.").

physician, then the Division shall be responsible for such cost.[17]

## V.

## CONCLUSION

Prior to our holding in this case, there existed no settled principals of law guiding how to select which audiogram to use as a basis for a permanent partial disability award when two audiograms both were initially deemed to be valid, but differed by a significant margin. Consequently, because we herein establish temporary guidelines for the resolution of such an occurrence, and because the two audiograms submitted in connection with the instant claim were both initially deemed valid and differed by a margin of more than plus or minus ten decibels, this case is reversed and remanded for Mr. Blackburn to undergo additional testing. Furthermore, we reiterate to the Division that the guidelines established in this opinion are *temporary*. Therefore, in directing the Division to establish it's own rules, in accordance with the appropriate statutory requirements, we further direct the Division to promulgate its rules within a reasonable time.

Reversed and Remanded.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

ALBRIGHT, Justice, concurring in part, and dissenting in part:

(Filed Dec. 11, 2002)

I respectfully dissent from the portion of the majority opinion formulating temporary rules for determinations of awards in Work-

ers' Compensation hearing loss cases. While I do not necessarily disagree with the substance of the rules formulated by the majority, I believe that this Court has exceeded its authority by engaging in what is essentially a rule-making function, regardless of the fact that such rules are intended as only interim rules. A complex system exists within this State for the consideration and promulgation of rules within the Workers' Compensation realm. The West Virginia Legislature has clearly articulated that rule-making authority rests within administrative and legislative bodies, rather than this Court. As this Court aptly recognized in footnote five of *Chico Dairy Co., Store No. 22 v. West Virginia Human Rights Commission,* 181 W.Va. 238, 382 S.E.2d 75 (1989), "[s]everal sections of the State Administrative Procedures Act, as amended effective May 11, 1982, state the legislature's concerns with the manner in which the rules of state administrative agencies are promulgated, emphasizing legislative oversight of rules which are legislative in character." 181 W.Va. at 243 n. 5, 382 S.E.2d at 80 n. 5.

In addition, the Legislature has placed within the workers' compensation scheme a particularized process for the development and promulgation of rules relating to that subject. *See* W.Va.Code § 21A–3–7(c) (1993) (Repl.Vol.2002). This Court possesses only limited powers to make rules regulating the judiciary and legal profession, as contemplated by West Virginia Constitution, Article VIII, § 8. *See Gilman v. Choi,* 185 W.Va. 177, 406 S.E.2d 200 (1990), overruled on other grounds, *Mayhorn v. Logan Medical*

---

**17.** The author of this opinion, separate from the majority, wishes to clarify that this opinion is not inconsistent with my dissenting opinion in *State ex rel. McKenzie v. Smith,* 212 W.Va. 288, 307, 569 S.E.2d 809, 828 (2002). In *McKenzie,* I criticized the majority for using the extraordinary remedy of mandamus to usurp the Workers' Compensation Division's discretionary authority to promulgate rules related to vocational rehabilitation by dictating the precise rule that would be imposed. In the instant opinion, however, instead of usurping the Division's discretionary authority, we have merely directed it to exercise that authority, and provided some guidance for the administration of hearing loss claims until such time as the Division is able to place its own rules into effect. *See, e.g., Bilbrey,* 186 W.Va. at

324, 412 S.E.2d at 518 ("During oral argument, counsel for the Commissioner informed this Court that a Health Care Advisory Panel has been formed within the Workers' Compensation office, in which protocols for testing are being established for the various occupational diseases and injuries which are subject to dispute before the Workers' Compensation Fund. Unfortunately, the Panel is not due to address this issue for several months. *In the meantime, we believe the Workers' Compensation Commissioner needs direction in developing a uniform manner of determining the percentage of impairment.*") (Emphasis added). For similar reasons, this opinion is not inconsistent with my dissenting opinion in *Repass.*

*Found.,* 193 W.Va. 42, 454 S.E.2d 87 (1994). The majority's development of rules for determining permanent partial disability awards based upon audiograms, while perhaps well-intentioned and designed, simply exceeds the authority of this Court. To remain within the confines of this Court's authority, the majority should have limited itself to a basic recitation of the issues to be considered in agency rule-making action and the establishment of a firm deadline for such action.

This Court improvidently entered this arena in *Bilbrey v. Workers' Compensation Commissioner,* 186 W.Va. 319, 412 S.E.2d 513 (1991), and created the dilemma of judicial intervention in areas more properly addressed by administrative and legislative bodies. I agree with the majority in the case sub judice that the principles of *Bilbrey* have been administered in such manner as to create no reliability in hearing loss awards. I further agree with the majority that additional guidelines do need to be developed by the Workers' Compensation Division to address the areas discussed in the majority opinion regarding reliability of audiograms.

### Rule of Liberality

I also write separately to reiterate and reemphasize that the Rule of Liberality, as consistently implemented by this Court, is not merely a rule of liberal construction of a statute; it also addresses the weight to be given to evidence provided by the claimant. The origin of the "liberality rule" can be traced to the first Workmen's Compensation Act, Acts of the Legislature, 1913, chapter 10, § 44, as follows:

Such commission shall not be bound by the usual common law or statutory rules of evidence, or by any technical or formal rules of procedure, other than herein provided, but may make the investigation in such manner as in its judgment is best calculated to ascertain the substantial rights of the parties and to *carry out justly and liberally the spirit of this act.*

See *Johnson v. State Workmen's Compensation Com'r,* 155 W.Va. 624, 631–32, 186 S.E.2d 771, 776 (1972). This Court acknowledged the spirit of workers' compensation legislation prior to the 1913 legislative pronouncement. In 1910, this Court explained: "That which is plainly within the spirit, meaning and purpose of a remedial statute, though not therein expressed in terms, is as much a part of it as if it were so expressed." Syl. Pt. 1, *Hasson v. City of Chester,* 67 W.Va. 278, 67 S.E. 731 (1910). Judicial recognition of this principle also occurred in 1928 in *Caldwell v. Compensation Commissioner,* 106 W.Va. 14, 144 S.E. 568 (1928), in which this Court held that a spirit of liberality should be employed in applying the *provisions* of the Workmen's Compensation Act.

In *Machala v. State Compensation Commissioner,* 109 W.Va. 413, 155 S.E. 169 (1930), the rule was extended to the construction and interpretation of *evidence.* In that regard, our law differs from that of other states. But the application of the rule of liberality to the consideration of evidence has now been so firmly established in our law for over seventy years as to be beyond question or doubt. Very importantly, however, the Rule of Liberality is not to be utilized as a *substitute* for the claimant's duty to produce substantial evidence of the claim. In syllabus point one of *Hoff v. State Compensation Commissioner,* 148 W.Va. 33, 132 S.E.2d 772 (1963), overruled on other grounds, *Brogan v. Workers' Compensation Commissioner,* 174 W.Va. 517, 327 S.E.2d 694 (1984), this Court emphatically advised:

Although the liberality rule in the interpretation of evidence in Workmen's Compensation cases is approved by this Court, the burden of establishing a claim for compensation rests upon the person asserting such claim. The rule of liberality will not take the place of required proof, and an award of compensation cannot be made on hearsay alone.

See also *Eady v. State Compensation Com'r,* 148 W.Va. 5, 12, 132 S.E.2d 642, 646–47 (1963). Thus, the liberality rule must be balanced against the ultimate responsibility of this Court and administrative bodies to assure that awards are founded upon substantial evidence.

In summary, I concur with the majority's perception of the degree to which determinations of hearing loss awards are not uniformly managed. I further concur with the

majority's vision of the manner in which determinations of such awards, through appropriate rule-making authority, should be altered. I respectfully dissent, however, with regard to this Court's determination that it has the authority to fabricate interim rules for application while the system awaits agency response to this Court's mandate. I would have set a reasonable deadline for administrative correction of the defects in reliability recognized by the Court and acknowledged, on grounds of comity, the need for judicial restraint until and unless judicial intervention became unavoidable by reason of administrative inaction.

MAYNARD, Justice, dissenting:

(Filed Dec. 9, 2002).

I have three problems with the majority opinion. First, I believe that it is incorrect in light of the facts of this case. There are two audiogram results at issue here. Mr. Blackburn was examined by Dr. Joseph Touma and underwent audiometric testing administered by Laura Bedell Garish, a certified Clinical Audiologist. The reliability of the audiogram was rated "fair to good." Based upon the examination and the results of the audiogram, Dr. Touma concluded that Mr. Blackburn had suffered a 10.65% impairment as a result of noise-induced hearing loss. Subsequently, Mr. Blackburn was examined by Dr. Sherman Hatfield and given an audiogram by Brenda D. George, a certified audiologist. The reliability of the audiogram was rated "good." Based on this examination, Dr. Hatfield recommended and the claimant ultimately received a .73% impairment award.

The uncontroverted evidence supports this award. Dr. Touma was deposed in connection with a protest, and he testified that Dr. Hatfield's audiogram revealed better thresholds than his own. Dr. Touma also testified that Dr. Hatfield's audiogram produced a more accurate representation of Mr. Blackburn's true hearing loss impairment. Therefore, there is no expert disagreement that the most accurate audiogram was Dr. Hatfield's on which the .73% whole person impairment is based! Accordingly, this Court should have accorded proper deference to the Workers' Compensation Appeal Board decision and affirmed it.

Second, although there is precedent for the practice, and I admit I have participated in it in the past, I am nevertheless uncomfortable with this Court crafting procedural rules for the Division to follow such as those found in syllabus points 2 and 3 of the majority opinion. As set forth in footnote 15 of the majority opinion, the Health Care Advisory Panel is charged by statute to assist with the "[e]stablish[ment of] protocols and procedures for the performance of examinations or evaluations performed by physicians or medical examiners," W.Va.Code § 23–4–3b(b) (1990), and the Compensation Programs Performance Council is charged with reviewing these protocols and procedures. Even though the rules crafted by this Court are temporary, I still believe that the Court oversteps its bounds when it assumes authority statutorily granted to the Division.

Finally, I am concerned with the effect the majority opinion will have on the Workers' Compensation Fund deficit. The Workers' Compensation System in West Virginia is in deep financial trouble. In the past several weeks, a number of articles [1] have appeared in local newspapers about the size of this deficit which Employment Programs Commissioner Bob Smith estimates at between 2.4 and 2.6 billion dollars.[2] In response to the question "How close are we to bankruptcy," Commissioner Smith replied, "If we didn't do anything, we'll get there." [3] I am fairly confident that the Workers' Compensation Division and the Legislature will take steps to reduce the deficit. I am hopeful but

1. *See*, e.g., Jim Wallace, *Comp Funds A Concern For Board Officials Worry Investments Won't Cover Liability*, Charleston Daily Mail, November 15, 2002, at 2C; Lawrence Messina, *Workers' Comp Debt Skyrockets*, The Charleston Gazette, November 19, 2002, at 1A; and Jim Wallace, *Deficit Stuns Officials*, Charleston Daily Mail, November 19, 2002, at 1A.

2. Jim Wallace, *Deficit Stuns Officials*, Charleston Daily Mail, November 19, 2002, at 1A.

3. Lawrence Messina, *Workers' Comp Debt Skyrockets*, The Charleston Gazette, November 19, 2002, at 1A.

less confident that this Court will cooperate with those steps. State Senator Ed Bowman may have hit the nail on the head when he said, in regards to this Court's treatment of 1995 amendments to the workers' compensation system, "[t]hese court decisions are killing us. I have a belief right now that these court decisions have had a financially adverse effect on the fund." [4] I fear that the instant decision will only add to the ever-burgeoning workers' compensation deficit.

To be fair, the majority opinion is well reasoned and doubtless intended to ensure that the Workers' Compensation Division promulgates rules for administering audiograms in hearing loss cases in an equitable manner. If I were to view the majority opinion in a vacuum, I may find little with which to disagree. However, I must evaluate the majority opinion in the context of how this Court will use it in reviewing workers' compensation appeals. As I have noted previously, this Court's workers' compensation jurisprudence is result driven. This is especially evidenced in its routine abuse of the rule of liberality. In a previous dissent, I wrote,

> the Court routinely abrogates legislative mandates by resorting to the so called "rule of liberality[.]" ... While arguably application of a liberality rule is warranted where the parties' evidence is evenly balanced, this Court regularly abuses the rule to find for the claimant where his or her evidence is grossly inadequate. ...

> According to the "Workers' Compensation Training Manual" promulgated by the Workers' Compensation Division, "[t]he Liberality Rule is something of which you should be aware. It is not something you should routinely resort to in justifying an award of benefits. In fact, citations to the rule should almost never be included in your decisions." Further, "[i]t is important to emphasize that the Liberality Rule is no substitute for proof of entitlement to workers' compensation benefits." This Court, however, routinely cites to the lib-

erality rule and uses it to justify its decisions in workers' compensation appeals. *Martin v. Workers Compensation Div.*, 210 W.Va. 270, 285, 557 S.E.2d 324, 339 (2001) (Maynard, J., dissenting).

Based on *Bilbrey v. Workers' Comp. Comm'r*, 186 W.Va. 319, 412 S.E.2d 513 (1991), hearing loss cases have constituted the one type of workers' compensation appeal where the rule of liberality could not be used by this Court as a legal justification for automatically awarding the claimant the highest impairment rating contained in the record. By abrogating the rule in *Bilbrey*, the majority opinion subjects all workers' compensation hearing loss cases appealed to this Court to the same unwarranted use of the liberality rule.[5] I fear the result will be a very significant increase in the size of awards paid in hearing loss cases regardless of whether such awards are supported by the evidence. This, in turn, can only add to the funding problems of an already greatly overburdened system. Accordingly, I dissent.

---

4. Id.

5. While I understand that, pursuant to syllabus points 2 and 3 of the majority opinion, the liberality rule is to be used only "[u]ntil such time as the Workers' Compensation Division has promulgated additional rules for administering audi-

ograms in workers' compensation hearing loss cases," now that *Bilbrey* is a dead letter I am convinced that this Court will continue to apply the liberality rule to hearing loss cases in perpetuity.